UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARY M.,[1]

                                    Plaintiff                DECISION and ORDER

-vs-

                                              1:22-CV-00939-CJS

COMMISSIONER OF SOCIAL
SECURITY,

                                   Defendant.
_____

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Supplemental Security Income ("SSI") benefits.   Plaintiff maintains that such determination is affected by errors of law and not supported by substantial evidence.     Now before the Court is Plaintiff's motion (ECF No. 9) for judgment on the pleadings and Defendant's cross-motion (ECF No.12) for the same relief. For reasons discussed below, Plaintiff's application is denied, Defendant's application is granted, and this matter is dismissed.

## STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

A five-step sequential analysis is used to evaluate disability claims. *See* 20

---

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment[2] which significantly limits his physical or mental ability to do basic work activities.[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[4] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[5]

---

[2] "At step two, the ALJ must determine whether the claimant has a 'severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement.' *Id*. If not, the claimant is deemed not disabled, and the inquiry ends." *Koch v. Colvin*, 570 F. App'x 99, 101 (2d Cir. 2014); *see also*, 20 C.F.R. § 404.1520(a)(4)(ii) ("At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.").

[3] The Commissioner's Regulations define basic work-related activities as follows: "Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include— (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."   20 C.F.R. § 404.1522 (West 2023).

[4] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[5] "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or, where the claimant has a non-exertional impairment, by taking testimony from a vocational expert [("VE")]. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law

judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted); *see also, Snyder v. Comm'r of Soc. Sec*., No. 22-277-CV, 2023 WL 1943108, at *1 (2d Cir. Feb. 13, 2023) ("While the substantial evidence standard requires we find more than a mere scintilla of support for the Commissioner's decision, it is still a very deferential standard of review requiring us to uphold the Commissioner's findings unless a reasonable factfinder would *have to conclude otherwise*.") (emphasis in original; citations and internal quotation marks omitted); *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022) ("We may vacate the agency's disability determination only if it is based on legal error or unsupported by 'substantial evidence'—that is, if no reasonable factfinder could have reached the same conclusion as the ALJ.").

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).   "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).   "In other words, this Court must afford the Commissioner's determination considerable deference, and 'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.'" *Melia v. Colvin*, No. 1:14-CV-00226 MAD, 2015 WL 4041742, at *2 (N.D.N.Y. July 1, 2015) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

Also, when considering whether a particular finding or decision is supported by substantial evidence, a court may not rely on any *post hoc* rationalizations offered by the Commissioner, but it may consider evidence that was evidently considered by the ALJ even if it was not expressly mentioned in the administrative decision. *See, Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have

5

mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability. *E.g., Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir.1982). In *Berry*, we noted that, although we would remand for further findings or a clearer explanation where we could not fathom the ALJ's rationale "in relation to evidence in the record," we would not remand where "we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Id. See also Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between the reports of [two doctors], we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony ...."))."; *see also*, *Loni S. v. Comm'r of Soc. Sec.*, No. 3:22-CV-805 (CFH), 2023 WL 4195887, at *19 (N.D.N.Y. June 27, 2023) ("The Court is required to look at the entire ALJ's decision when reviewing for substantial evidence. *See John L. M. v. Kijakazi*, No. 5:21-CV-368 (BKS/TWD), 2022 WL 3500187, at *2 (N.D.N.Y. Aug. 18, 2022) (citations omitted) ('[W]hile a reviewing court may not affirm the Commissioner's decision based on an impermissible *post-hoc* rationalization, it may affirm where the ALJ's consideration of the relevant factors can be gleaned from the ALJ's decision as a whole.').").

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the factual and procedural history of this action, which is set forth in the parties' papers.   The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

On August 14, 2018, Plaintiff applied for SSI benefits, claiming to be disabled due

to bipolar disorder, post-traumatic stress disorder ("PTSD") and seizures.

After Plaintiff's claim was denied initially and on reconsideration, she had a hearing before an ALJ, at which she and a VE testified.

On January 31, 2022, the ALJ issued a Decision (Tr. 20-30) finding that Plaintiff was not disabled at any time between the application date and the date of his decision. The ALJ conducted the five-step sequential evaluation and found, in pertinent part, that Plaintiff had severe impairments consisting of bipolar disorder, PTSD, anxiety disorder, "alcohol use disorder in early remission," syncope/pseudoseizure, traumatic brain injury, and obesity; that those impairments, either singly or combined, did not meet or medically equal a listed impairment; that Plaintiff had,

> the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she can lift 20 lbs occasionally and 10 lbs frequently; she can stand and walk for 6 of 8; she can sit for up to 8 hours in an 8-hour workday; she can never climb ladders, ropes, or scaffolds; she can occasionally climb ramps and stairs; she can occasionally balance, stoop, kneel, crouch, and crawl; she must avoid all exposure to unprotected heights and dangerous machinery, excessive vibration, and excessive noise; and she is limited to simple, routine tasks in a work environment free of fast-paced production, involving only simple work-related decisions with few, if any, workplace changes and only occasional interaction with the public and co-workers[;]

that Plaintiff had no past work; that with the aforementioned RFC, Plaintiff could perform other work, namely, the jobs of mail clerk (non-postal), office helper, and shipping & receiving clerk; and that Plaintiff was therefore not disabled.

Plaintiff, though, maintains in this action that the ALJ's decision is erroneous in the following respects: 1) the ALJ's RFC finding failed to include "social limitations" (*i.e.*, limits

on interactions with supervisors) from a medical opinion that the ALJ found "persuasive"; 2) the ALJ failed to consider the episodic nature of Plaintiff's bipolar disorder and mischaracterized her mental health treatment history by "cherry picking" evidence; and 3) the ALJ incorrectly stated that Plaintiff had not experienced any seizures or seizure-like activity after the disability onset date.

Defendant disagrees and insists that the ALJ's decision is free from error and supported by substantial evidence.   Alternatively, Defendant contends that any error was harmless.   For example, Defendant contends that to the extent the ALJ erred by failing to include a limitation on interactions with supervisors in the RFC finding, the error was harmless since, according to the VE's testimony, the jobs identified by the ALJ at Step 5 of the Sequential Evaluation all required only incidental interaction with supervisors.

The Court has considered the parties' submissions, including Plaintiff's reply, and the entire administrative record.

DISCUSSION

As mentioned earlier, Plaintiff here first contends that the ALJ committed legal error by failing to include, in his RFC finding, a limitation contained in a medical opinion that he purportedly found "largely persuasive."   More specifically, the ALJ stated that he found "largely persuasive" an opinion from consultative examining psychologist Stephen Farmer, Psy.D. ("Farmer"), indicating, in pertinent part, that Plaintiff had "mild to moderate limitation interacting adequately with supervisors, co-workers and the public." Tr. 22, 560. As indicated above, the ALJ's RFC finding limited Plaintiff to "only occasional interaction with the public and co-workers," but did not similarly limit interaction with supervisors.

8

Plaintiff contends that remand is required since the ALJ failed to explain this discrepancy.

Defendant, though, contends that any such error was harmless, since the VE testified that all three jobs cited by the ALJ at Step Five of the Sequential Evaluation required only "incidental exposure to coworkers and supervisors." Tr. 60.

The Court agrees with Defendant that any error in this regard was harmless.   In reaching this conclusion, the Court observes, preliminarily, that to the extent Plaintiff contends that remand is required simply because the ALJ did not adopt all the limitations contained in Farmer's opinion, her argument lacks merit since an ALJ's RFC finding need not mirror any single medical opinion. *See, Davis v. Kijakazi*, No. 21CV8485VECBCM, 2023 WL 5726054, at *12 (S.D.N.Y. Aug. 18, 2023) ("Regardless of how many medical source statements the ALJ receives – or the weight he assigns to them – the determination of the claimant's RFC is reserved to the ALJ, who is not required to accept, or follow, any one medical opinion. *See Camille v. Colvin*, 652 F. App'x 25, 29 n.5 (2d Cir. 2016) (summary order) ("An ALJ may accept parts of a doctor's opinion and reject others."), report and recommendation adopted sub nom. *Davis v. Comm'r of Soc. Sec.*, No. 21-CV-8485 (VEC), 2023 WL 5723011 (S.D.N.Y. Sept. 5, 2023).   The issue for the Court, rather, is whether the ALJ's RFC finding is supported by substantial evidence. *See, id*. ("[I]t is the ALJ's prerogative to make an RFC assessment after weighing the evidence and the District Court may not reverse provided there is substantial evidence in the record to support her findings.").

Moreover, an ALJ is not required to adopt every limitation contained in a medical opinion even where, as here, he finds the opinion overall to be persuasive. *See, Kenneth*

*H. v. Comm'r of Soc. Sec.*, No. 1:21-CV-735-DB, 2023 WL 6065026, at *9 (W.D.N.Y. Sept. 18, 2023) ("[T]he ALJ was not required to wholesale adopt Dr. Lee's opinion solely because it was found to be persuasive, as Plaintiff appears to argue. *See Barry v. Colvin*, 606 F. App'x 621, 624 (2d Cir. 2015) (ALJ's RFC finding need not include every limitation assessed by a consultative examiner, and ALJ could, instead, exercise discretion in reviewing the record evidence in its totality); *see also Fancher v. Comm'r of Soc. Sec.*, No. 19-cv-158 (KS), 2020 WL 5814359, at *5 (W.D.N.Y. Sept. 30, 2020) ("An ALJ is not required to adopt wholesale the opinion of any one medical source, but is entitled to weigh all of the evidence available to make an RFC finding that is consistent with the record as a whole.").

However, where an ALJ makes an RFC finding that conflicts with a medical opinion, the ALJ must explain why the conflicting opinion was not adopted. *See*, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. *If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted*.") (emphasis added).

> Generally, an ALJ must reconcile discrepancies between his or her RFC assessment and medical source statements. SSR 96-8p, 1996 WL 374184, at *7; *see Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006). "If the ALJ's RFC finding conflicts with an opinion from a medical source, the ALJ 'must explain why the opinion was not adopted.'" *Williams v. Colvin*, No. 13-roncv-5431 (RLE), 2015 WL 1223789, at *8 (S.D.N.Y. Mar. 17, 2015) (quoting SSR 96-8p); *accord Garcia v. Berryhill*, No. 17-cv-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018). While an "ALJ is not required to explicitly reconcile every conflicting shred of evidence in the record, an ALJ cannot simply selectively choose

evidence in the record that supports [his] conclusions." *Williams*, 2015 WL
1223789, at *8 (cleaned up); *see also Balsamo v. Chater*, 142 F.3d 75, 81
(2d Cir. 1998) (an ALJ may not "arbitrarily substitute his own judgment for
competent medical opinion").

*Lynch v. Commissioner*, No. 22CIV5620CSAEK, 2024 WL 728483, at *11 (S.D.N.Y. Feb.
21, 2024).

Although, an ALJ's error in failing to provide such an explanation may be deemed
harmless where it did not affect the outcome of his decision. *See, Zabala v. Astrue*, 595
F.3d at 409 ("Remand is unnecessary, however, where application of the correct legal
standard could lead to only one conclusion.") (citation and internal quotation marks
omitted); *see also*, *Jennifer A. v. Comm'r of Soc. Sec.*, No. 1:22-CV-1167 (MAD), 2023
WL 8654215, at *6 (N.D.N.Y. Dec. 13, 2023) ("The ALJ's failure to discuss Dr. Juriga's
subsequent medical opinion is error.   However, remand is unnecessary where
application of the correct legal principles to the record could lead only to the same
conclusion.") (*citing, Zabala*, other citations and internal quotation marks omitted).

Here, the Court agrees with Defendant that even assuming the ALJ erred by failing
to incorporate Farmer's opinion limiting Plaintiff to only occasional interaction with
supervisors into the RFC finding, such error was harmless, since the three jobs that the
ALJ cited, at Step Five of the Sequential Evaluation, as being jobs that Plaintiff could still
perform, all involved only incidental contact with supervisors. Tr. 60.   Consequently, this
aspect of Plaintiff's motion is denied.

Plaintiff, though, contends that the ALJ also erred by failing to explain how his RFC
finding accounts for another opinion by Farmer, that Plaintiff had "mild to moderate

limitation regulating emotions, controlling behavior, and maintaining well-being," Tr. 560, or for the ALJ's own finding that Plaintiff had "moderate" limitations in those areas.   On this point, Plaintiff states, in pertinent part:

> The ALJ's failure to explain how he incorporated Plaintiff's moderate limitation[s] in regulating emotion, controlling behavior, and maintaining well-being into the RFC finding, or otherwise explain why they were omitted from the RFC finding cannot be deemed harmless, as the [VE] did not testify what impact such limitations would have on Plaintiff's ability to obtain and sustain competitive, full-time employment, beyond [describing] the work preclusive limitations for off-task time, absences, and requiring supervision. Thus, the ALJ's ultimate finding that Plaintiff is capable of performing competitive work in the national economy is not supported by substantial evidence.

Pl. Memo of Law (ECF No. 9-1) at p. 17.

Essentially, Plaintiff contends that as a matter of law, an RFC finding cannot adequately account for moderate limitations in regulating emotion, controlling behavior, and maintaining well-being, merely by limiting a claimant to work involving "simple, routine tasks in a work environment free of fast-paced production, involving only simple work-related decisions with few, if any, workplace changes and only occasional interaction with the public and co-workers."

Defendant disagrees, and maintains that the RFC finding is supported by substantial evidence since the ALJ fully considered Plaintiff's mental health functioning and accounted for it by "includ[ing] numerous non-exertional limitations into the RFC, explicitly limiting Plaintiff to 'simple, routine tasks in a work environment free of fast-paced production, involving only simple work-related decisions with few, if any, workplace

12

changes and only occasional interaction with the public and co-workers."[6]

The Court again agrees with Defendant and finds that Plaintiff's argument lacks merit, since courts in this Circuit routinely hold that moderate limitations in regulating emotion, controlling behavior, and maintaining well-being are consistent with, and adequately accounted for, by the non-exertional limitations included by the ALJ here in his RFC finding. *See, e.g., Justine Michele P. v. Comm'r of Soc. Sec.*, No. 1:21-CV-01089 (JJM), 2024 WL 411966, at *5 (W.D.N.Y. Feb. 5, 2024) ("It is well-settled that up to moderate limitations of a plaintiff's ability to regulate emotions, control behavior, and maintain well-being are 'consistent with' an RFC limiting plaintiff to 'simple, routine, and repetitive tasks' and 'occasionally interacting with supervisors, coworkers, and the public.'") (*citing Michelle K. v. Commissioner*, 527 F.Supp.3d 476, 483 (W.D.N.Y. 2021)); *see also, Allisa P. v. Comm'r of Soc. Sec.*, No. 1:21-CV-556-DB, 2024 WL 278227, at *10 (W.D.N.Y. Jan. 25, 2024) ("Dr. Farmer's assessment of moderate limitations in regulating emotions, controlling behavior, and maintaining well-being is consistent with the ALJ's RFC finding for simple, unskilled, work involving limited social interaction.") (collecting cases).

Plaintiff next maintains that remand is required because the ALJ failed to consider the episodic nature of her bipolar disorder and mischaracterized her mental health treatment history by "cherry picking" evidence that supported a finding that she was not disabled.   For example, Plaintiff states:

Mental illness, especially bipolar disorder, can be episodic by nature and

---

[6] Def. Memo of Law (ECF No. 12-1) at pp. 9-10.

regularly fluctuate even under proper treatment.   Indeed, a person
suffering from bipolar disorder may be vulnerable to violent mood swings
resulting in better days and worse days, and a claimant's stability on some
days does not necessarily support the conclusion that he is able to work
every day.   In his decision, the ALJ improperly cherry-picked Plaintiff's
treatment records to highlight periods when Plaintiff reported feeling
"normal" and being "satisfied with [her] medications." T. 21. But there were
multiple instances in the record where Plaintiff reported increased anxiety,
inability to sleep, conflicts with others, irritability, and increased panic
attacks.

Pl. Memo of Law (ECF No. 9-1) at p. 18 (some citations and internal quotation marks

omitted).   Plaintiff argues that the ALJ improperly cherry-picked evidence in this manner

both at Step 3 of the Sequential Evaluation and when making his RFC finding.

Plaintiff also contends that the ALJ misstated an important fact, by indicating that

she had elected to stop attending mental health therapy in September 2020, when,

actually, "the evidence plainly shows that [she] did not decline to attend any further

therapy sessions because she felt she no longer needed therapy at all – she was simply

transferring therapy to a different provider."[7]   Plaintiff admits that the ALJ correctly noted

that she subsequently attended counseling sessions with a different provider,   but

contends that he nevertheless "blatantly mischaracterized" the consistency with which

she continued seeing such provider.

Essentially, Plaintiff maintains that the ALJ's determination, that her mental health

symptoms were controlled with medication and counseling, is not supported by

substantial evidence, since it is the result of "cherry picking," and since the evidence,

---

[7]  Pl. Memo of Law (ECF No. 9-1) at p. 19.

14

properly considered, actually shows that her mental impairments would prevent her from working on a regular and sustained basis.

Defendant disagrees and counters that the ALJ provided an accurate description of the evidence concerning Plaintiff's mental health that "addressed the entire mental health treatment history, including periods of increased symptoms."[8]   Defendant also points out that "there were no medical opinions to support Plaintiff's contention of disabling mental limitations."[9]

Of course, an ALJ is not permitted to "cherry pick" evidence that supports his RFC finding. *See, Bohart v. Astrue*, No. 10-CV-6503, 2011 WL 2516413, at *5 (W.D.N.Y. June 23, 2011) ("An ALJ cannot selectively choose the only portions of a medical opinion that support his determination, while ignoring others.") (citations omitted).

> Cherry-picking can be defined as "inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source." *Artinian v. Berryhill*, No. 16-cv-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018). Cherry-picking can "indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Id*. (quoting *Younes v. Colvin*, No. 1:14-cv-170, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015)). But an allegation of cherry-picking is "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014). Indeed, what a claimant may label as cherry-picking can often be described "more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).

*Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *3 (D. Conn. June 21,

---

[8]  Def. Memo of Law (ECF No. 12-1) at p. 10.
[9]  Def. Memo of Law (ECF No. 12-1) at p. 10.

2022).[10]   Certainly, however, remand may be appropriate where a plaintiff demonstrates that an ALJ engaged in cherry picking or otherwise mischaracterized evidence. *See, Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 585 (S.D.N.Y. 2022) ("Courts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary.").

Here, however, the Court does not agree that the ALJ "failed to consider" the "episodic nature" of Plaintiff's bipolar disorder or "cherry picked" evidence, as Plaintiff claims.   As a preliminary matter, the Court observes that the particular entries in Plaintiff's mental health treatment record that she cites as evidence of the "episodic nature" of her bipolar disorder that the ALJ allegedly ignored,[11] are largely instances in which she merely reported increased anxiety due to specific unusual life stressors, including the Commissioner's determination of her SSI application, having to go to court for violating an order of protection, and the onset of the Covid-19 pandemic.   That is, they are events about which most people would likely have some degree of increased anxiety even if they were not suffering from bipolar disorder.   Moreover, those entries do

---

[10] *See also, Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (Observing that some impairments, such as depression, may have symptoms that wax and wane, and that, "in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see also Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days.... Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."). When viewed alongside the evidence of the apparently cyclical nature of Estrella's depression, the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimizing Dr. Dron's opinion.").
[11] *See*, Pl. Memo of Law (ECF No. 9-1) at p. 18 (Citing to Transcript pages 751, 753, 758, 810, 975, 978, 1006, 1018, 1022, 1038-39, 1049, 1056-57, and 1214).   The Court estimates that the relevant text from these entries might amount to, at most, one page of the 1476-page administrative transcript.

not appear to show that Plaintiff's increased symptoms of anxiety, irritability, difficulty sleeping, etc., were of disabling severity, even on those occasions.   Consequently, the Court does not consider those entries to be strong evidence of Plaintiff's disability, and therefore does not find the ALJ's failure to discuss those entries to be suggestive of improper cherry picking.

Also, the ALJ went out of his way to find that Plaintiff's mental limitations were even *more severe* than what two medical experts indicated.   Specifically, citing "the longstanding nature of the claimant's [mental] impairments and her obvious need for medication management," the ALJ first expressly gave Plaintiff the benefit of the doubt and found that her mental impairments were more severe than what the consultative psychologist, Dr. Farmer, had found:

> [A] consultative examiner, Dr. Stephen Farmer, opined that the claimant has "mild to moderate" limitations with respect to her ability interact with others and her ability to regulate emotions, control behavior, and maintain well-being, but that the claimant's mental health limitations were otherwise mild. I find Dr. Farmer's assessment to be largely persuasive here, as it is well-supported by medical records in evidence showing that when compliant with her medications, the claimant's mental health symptoms are well-controlled. I do note, however, that in reading the record in a manner most favorable to the claimant, and considering the longstanding nature of the claimant's impairments and her obvious need for medication management, a finding of moderate limitations with respect to her ability to interact with others, her ability to concentrate, persist, and maintain pace, and her ability to adapt or manage herself is more appropriate.

Tr. 19.   The ALJ similarly found Plaintiff's mental health symptoms to be *more limiting* than did another medical expert, Dr. Juriga, who indicated that such symptoms were "no more than mild":

> I note that a state medical consultant, Dr. Juriga, opined that the claimant has no more than mild mental health limitations.   I am largely unpersuaded by this assessment, as while the record does show that the claimant's mental health symptoms are well-controlled, it also demonstrates the claimant's need for consistent medication management, which suggests overall limitations that are more than mild.

Tr. 19.

The Court finds that these actions by the ALJ are inconsistent with the notion that he understated the severity of Plaintiff's symptoms.   Rather, these statements are consistent with the main theme of the ALJ's decision, which was that Plaintiff's mental health impairments, while moderate in severity, were nevertheless very "manageable" with medication. *See, e.g.*, Tr. 22 ("The overall manageability of the claimant's mental health impairments is confirmed by the medical opinion evidence in the record."); *see also*, Tr. 21 ("[T]he record demonstrates that the claimant's mental health symptoms have been controlled with prescription medications and psychological counseling.").

Plaintiff, though, insists that the ALJ mischaracterized the record when he asserted that in September, 2020, she "declined to attend any further therapy sessions" and subsequently attended only "some counseling sessions with a different provider."   Tr. 21. According to Plaintiff, "The ALJ's statement that she 'attended some counseling sessions with a different provider,' without providing any acknowledgment of the consistency [with] which [she] saw Dr. Gordon or LCSW Andrew is a blatant mischaracterization of Plaintiff's mental health treatment and warrants remand."[12]

However, the Court again disagrees with Plaintiff.   To begin with, the ALJ did not

---

[12]  Pl. Memo of Law (ECF No. 9-1) at p. 20.

assert or imply that Plaintiff stopped attending mental health counseling altogether in September, 2020.  Rather, as evidence of how Plaintiff's mental health condition was controlled with medication and counseling, the ALJ correctly noted that, "on a number of occasions after the alleged onset date, the claimant denied experiencing any mental health symptoms whatsoever," and that, in September 2020, *she stated that* she "felt stable" enough that she "felt like she was in the position to be finished with counseling." Tr. 21.  Indeed, the treatment note to which the ALJ referred quotes Plaintiff as further stating that, going forward, "she wanted a counseling that was infrequent and more on an 'as needed' basis." Tr. 587.

The ALJ then further wrote: "Treatment records show that after she left therapy, the claimant continued receiving medication management and attended some counseling sessions with a different provider. (*see, e.g.*, Exhibit B17F; Exhibit B19F)." Tr. 21. The first exhibit cited by the ALJ in support of that statement, Exhibit B17F, is a 17-page exhibit showing that between October 27, 2020, and July 28, 2021, Plaintiff had approximately seven visits with psychiatrist Steven Gordon, M.D., for mental health medication management, and that she reported good results.   The second exhibit cited in support thereof, Exhibit B19F, is a 15-page exhibit showing that between August 19, 2021, and November 3, 2021, Plaintiff had five individual psychotherapy sessions with Sara Andrew, LCSW ("Andrew"), with the stated purpose being, "to continue working on her current treatment goal of maintaining mental health stability (manageable anxiety)." Tr. 816. Andrew generally reported unremarkable mental status examination findings, and that Plaintiff was doing well despite reporting some temporary increased anxiety with

particular situational stressors, such as applying for disability benefits and having personal disputes with her boyfriend's brother.   The Court finds nothing inaccurate in the ALJ's description of Plaintiff's mental health treatment after September 2020, contrary to Plaintiff's contention that he blatantly mischaracterized the evidence.   Again, it is not as if the ALJ found that Plaintiff was free from mental health symptoms after September 2020.   Rather, the ALJ found that Plaintiff still had moderate mental health symptoms, but that they continued to be well-managed by medication and counseling, and nothing cited by Plaintiff on this point shows that the ALJ improperly ignored evidence that her limitations were more than moderate.

Lastly, Plaintiff argues that remand is required since the ALJ "improperly found that [she] had not experienced any seizure or seizure-like activity after the amended onset date," August 14, 2018.   Plaintiff asserts that "the ALJ either mistakenly overlooked or purposely ignored evidence" to the contrary, since, "[i]n January 2019, Plaintiff reported an increase in her seizures," "[i]n February 2019, [she] reported that her last seizure had been the prior night," and "[i]n November 2019, an ambulance was called for [her] because she felt like she was going to faint at an appointment."[13]

However, the Court also finds that this argument lacks merit.   As a preliminary matter, Plaintiff is correct that the ALJ wrote in his decision that Plaintiff had been diagnosed with "syncope/pseudoseizure," but that there was "no indication that the claimant had experienced any seizure or seizure-like activity after the amended alleged

---

[13] Pl. Memo of Law (ECF No. 9-1) at p. 21.

onset date," and that the record did not "document any incidents of syncope for claimant during the relevant period." Tr. 21, 23.   Plaintiff is also correct that after the amended application date, in a medical note dated January 2, 2019, Plaintiff "reported an increase in seizures," Tr. 1027, and that on February 4, 2019, she vaguely reported that she "believed" she had a seizure the night before that had been triggered by "lights, flashes or loud noises." Tr. 562.   Accordingly, the record contains some evidence of seizure activity after the amended application date, contrary to what the ALJ wrote.[14]

However, even assuming that the ALJ erred in stating that there had been no seizure activity whatsoever after that date, the Court finds such error to be harmless, for several reasons.   To begin with, although the ALJ found that "syncope/pseudoseizure" was a severe impairment, it does not appear that the seizure condition was ever particularly significant in terms of frequency or severity of symptoms.   For example, contradicting what Plaintiff stated on February 4, 2019, a medical note dated February 10, 2019, indicates that Plaintiff had not had any seizures since childhood, Tr. 653 ("None since childhood."), and on February 4, 2020, Plaintiff told her primary care physician that she had not experienced any recent seizure activity. *See*, Tr. 779 ("She denies any seizures or pseudoseizure episodes.").   Also, when asked at the administrative hearing to explain why she could not work, Plaintiff never mentioned seizures or pseudoseizures, and, indeed, those conditions were never discussed during the hearing.[15]   Tr.

---

[14]  Although, some of the other evidence cited by Plaintiff on this point does not appear to actually show instances of seizures or pseudoseizure.   For example, on July 11, 2019, Plaintiff went to the ER complaining of abdominal pain and noted that she had been vomiting and had "blacked out," but there is no indication that such blacking out was related to pseudoseizure, and the discharge diagnosis was abdominal pain. Tr. 675.

[15]  Plaintiff did testify about having so-called emotional "meltdowns," in which she would "scream and just

But, more importantly, regardless of when Plaintiff's last seizure occurred, the ALJ included non-exertional limitations in the RFC finding to account for dangers posed to her by seizures,[16] and Plaintiff has not shown that any greater limitations were required.[17] Indeed, after stating that he saw no evidence of seizures or syncope after the alleged onset date, the ALJ immediately added:

> *Nonetheless*, in reading the record in a manner most favorable to the claimant, and taking into account her historical experiences with seizures and syncope, I have included restrictions with respect to her exposure to unprotected heights, dangerous machinery, excessive vibration, and excessive noise in the residual functional capacity [finding].

fall to the ground" and "start crying uncontrollably." Tr. 44.   Plaintiff testified that such "meltdowns" were triggered by a wide variety of things, including crowds, traffic, her failure to understand certain conversations, and her cats bothering her. Tr. 44-45.   However, neither Plaintiff nor her attorney referred to these "meltdown" incidents as seizures of pseudoseizures, and Plaintiff's counsel did not refer to this testimony when discussing the ALJ's alleged error concerning the date of Plaintiff's seizure activity, so it seems clear that the alleged "meltdowns" are different than the alleged seizures or pseudoseizures described in the medical notes. Moreover, the "meltdown" symptoms that Plaintiff described do not appear to match those associated with seizures or pseudoseizures. For example, Plaintiff indicated in her brief that her pseudoseizures involved her "fainting" or "blacking out." ECF No. 9-1 at p. 21.   Moreover, the National Institutes of Health states that, "[p]seudoseizures, psychogenic seizures, and hysterical seizures are older terms used to describe events that clinically resemble epileptic seizures but occur without the excessive synchronous cortical electroencephalographic activity that defines epileptic seizures.   . . .   Psychogenic nonepileptic seizures may be difficult to distinguish from epileptic seizures. Observation of waxing and waning consciousness, out-of-phase shaking movements, pelvic thrusting, side-to-side head shaking, and eye closure during the event suggest PNES. However, at times brief episodes of sudden unresponsiveness may represent the PNES event." *See*, "Psychogenic Nonepileptic Seizures," https://www.ncbi.nlm.nih.gov/books/NBK441871/

[16]  Plaintiff admits in her memo of law that "the ALJ included 'restrictions with respect to [her] exposure to unprotected heights, dangerous machinery, excessive vibration, and excessive noise' in the RFC finding" related to her seizure condition. ECF No. 9-1 at pp. 21-22.

[17]  Concerning the non-exertional limitations related to Plaintiff's seizures/syncope, the ALJ adopted the opinion of consultative examiner Nikita Dave, M.D., that Plaintiff "should avoid ladders, heights, sharp instruments, and machinery." Tr. 23.   Plaintiff contends that the ALJ also should have discussed "how long [she] would need to recover from a seizure, which [could contribute] to off-task time or absences," and that the ALJ also should have included a limitation in the RFC finding for exposure to "lights and flashes," since "Plaintiff reported that her seizures could be triggered by lights and flashes." ECF No. 9-1 at p. 22.   However, it was Plaintiff's burden to establish disability, and the Court does not recall her submitting evidence that she would need a particular amount of time to recover from a seizure/syncope, nor has she shown that any of the jobs identified by the ALJ at Step Five of the Sequential Evaluation would involve exposure to "lights and flashes."

Tr. 23 (emphasis added).   Consequently, any error by the ALJ on this point was harmless.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 9) for judgment on the pleadings is denied, Defendant's cross-motion (ECF No. 12) for the same relief is granted, and the action is dismissed.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
       March 11, 2024

ENTER:

CHARLES J. SIRAGUSA
United States District Judge